UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:15-cr-81(3) |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| JOHN DIXON, | : | |
| Defendant. | : | |

_____

**ENTRY AND ORDER DENYING DEFENDANT JOHN DIXON'S MOTION TO SUPPRESS PRETRIAL IDENTIFICATION (DOC. 57)**
_____

This case is now before the Court on Defendant John Dixon's Motion to Suppress Pretrial Identification ("Motion to Suppress") (Doc. 57). Dixon is charged with one count of conspiracy to distribute heroin and cocaine under the Second Superseding Indictment. (Doc. 49 at 1-2.) Dixon moves to suppress four witnesses' pretrial identifications on the grounds that the identification process was unduly suggestive, inherently flawed, and prejudicial in violation of his due process rights. The Court held evidentiary hearings on the Motion to Suppress, at which the Government presented testimony from two law enforcement officers and the four witnesses who made the pretrial identifications at issue. Dixon and the Government submitted post-hearing memoranda and the matter is now ripe for review. (Docs. 91, 96, 97.) For the reasons stated below, the Court **DENIES** the Motion to Suppress.

I.     FACTUAL BACKGROUND

    A.     Creation of the Photo Array Used in the Pretrial Identifications

Gregory Gaier ("Gaier") testified that he has been a police officer with the City of Dayton

for 22 years and is currently assigned to the Southern Ohio Federal Bureau of Investigation ("AFBI") Safe Streets Task Force – a federal task force dedicated to investigating gang members and individuals involved in the commission of violent crimes as well as drug trafficking.  (Doc. 80 at PageID # 418-419.)   In this capacity, Gaier was involved in the investigation of a local drug trafficking organization involving John Dixon, Evan Dixon, Denzel Dixon, Gerald Payne and others ("Dixon organization").  (*Id*. at PageID # 419.)   During the course of the investigation, Gaier was tasked with assembling a photo array of individuals identified or believed to be associated with this particular drug organization.   (*Id*. at PageID # 419-20.)

Gaier testified that as individuals were identified by law enforcement he obtained the most recent photographs of them from either the Montgomery County Justice Web ("Justice Web") computer database or the OLEG system.   (*Id*. at PageID # 420, 425.)   Justice Web is a criminal database that collects photographs of all individuals booked into jails in the tri-county area and the OLEG system is the Ohio Bureau of Motor Vehicles database.  (*Id.*)   The photographs were displayed on two pages – six on the first page and two on the second page.   Each photograph was in color and depicted the face of each of the individuals – commonly referred to as a head shot. (*Id*. at PageID # 420-421.)   The photographs depicted African-American men of varying ages and features.   None of the photographs depicted police placards or jail attire.   Additionally, none of the photographs contained any identifying information or referenced any names.   (*Id*. at PageID # 443-444.)

Once the photo array was completed, Gaier emailed a color copy to other members of the task force.   (*Id*. at PageID # 421.)   Gaier explained that the eight photographs chosen were of individuals that law enforcement believed to be associated with the Dixon organization.   The three individuals depicted at the top of page one were Evan Dixon, Denzel Dixon and Raphael

2

Garrett; the three on the bottom were Reuben Dixon, John Dixon and Gerald Payne. (*Id.* at PageID # 447-48.) The two individuals depicted on page two were Sherman Robinson and Charles Hicks. (*Id.*)

### B. Witness Identifications

Four witnesses—identified as "Witness A," "Witness B," "Witness D," and "Bryan"—testified that they had purchased heroin and/or cocaine from Dixon and identified Dixon in the photo array compiled by Gaier. Three of the identifications were administered on June 16, 2015 by Fred Zollers ("Zollers"), a deputy Sheriff with the Montgomery County Sheriff's Office, and Rick Bergman ("Bergman"), an FBI Task Force Officer. (*Id.* at PageID # 479-80.) The fourth identification was administered in October 2015 by Zollers and an FBI Task Force Officer named Fuller. (*Id.* at PageID # 508.)

#### 1. Witness A

Witness A is thirty-two years old and resides in the Dayton, Ohio area. (Doc. 81 at PageID # 566-67.) She began using illegal drugs when she was sixteen or seventeen years of age, including heroin, cocaine, marijuana and pills. (*Id.* at PageID # 568.) She first used heroin when she was nineteen years old, stopped using for a couple years beginning in 2009, and then relapsed for a year or two. (*Id.* at PageID # 568-69.) She continued this pattern of using heroin for a year or two and then not using for a year or two. (*Id.*) At the time of the hearing, Witness A had been clean for nine months, since November 12, 2015. (*Id.* at PageID # 569-70.) Witness A testified that when she was actively using heroin or under the influence of drugs, she did not remember everything, but believed that she remembered most things. (*Id.* at 597.)

On June 16, 2015, Detectives Zollers and Bergman met with Witness A at her residence. The officers identified themselves and explained that they were aware that she used heroin and

3

were there to find out more information about her history of drug usage and whom she had purchased drugs from. (*Id.* at PageID # 561, 572-573, 576.) Witness A was presented the photo array and asked to circle the photo of anyone from whom she had purchased heroin and write her initials (or name) and the date next to each circled photo. (*Id.* at PageID # 573, 576; Gov't Ex. 1(b).) At no time did the officers comment as to the individuals that she was either able or unable to identify. (*Id*. at PageID # 576-577.)

Witness A circled the photos of four individuals on the photo array. (Gov't Ex. 1(b).) She testified that she personally purchased both heroin and cocaine from these individuals in the Dayton, Ohio area from 2013 until she became clean in November 2015. (*Id*. at PageID # 579, 588.) Witness A further testified that the four individuals that she picked out were associated with one another. (*Id*. at PageID # 579-580.) She became familiar with the group after a friend provided her their number to purchase heroin. (*Id*. at PageID # 580.) Witness A stated that this group was her primary source of heroin from 2013 until she entered treatment in late 2015. (*Id*. at PageID # 580-581.) Every time Witness A called the number she was directed to varying locations to purchase heroin. (*Id*. at PageID # 581-582.) Once at the location, the drug transactions typically occurred from vehicle to vehicle, window to window. (*Id*. at PageID # 582.) During each of these transactions, Witness A had the opportunity to view the person selling her drugs and she typically recognized the person or persons each time. (*Id*. at PageID # 582-583.)

Witness A did not know the actual names of any of the individuals but did provide the nickname of "Mo" for John Dixon—one of the individuals she identified in the photo array. (*Id*. at PageID # 584.) During the course of buying drugs from this group, Witness A estimated that she purchased drugs on a daily basis, sometimes multiple times a day – morning, afternoon and

4

evening.  (*Id*. at PageID # 584-585, 588-589.)  Upon being questioned, Witness A was able to clearly describe her familiarity with each individual whom she identified in the photo array.  (*Id*. at PageID # 589-590.)  In particular, Witness A was able to recall a specific encounter approximately two weeks before being interviewed in which John Dixon accused her of driving a "cop car" when purchasing drugs.  (*Id*. at PageID # 591-592.)  She also recalled that John Dixon was "very mean" and "very rude."  (*Id.* at PageID # 589.)  She explained that John Dixon would call her names and would yell at her if she did not go to the correct location or if she called his phone too much.  (*Id.*)

Witness A testified that she was not under the influence of any controlled substances, drugs, alcohol, or anything else that would affect her ability to converse with law enforcement on the day she viewed the photo array with Detectives Zollers and Bergman.  (*Id.* at PageID # 577.)

### 2. Witness B

Witness B is Witness A's husband.  (*Id*. at PageID # 634-35.)  He is thirty-one years old and resides in the Dayton, Ohio area.  (*Id*. at PageID # 630.)  He holds a GED, some college education and is employed as a plumber.  (*Id.*)  Witness B has used several illegal controlled substances, including heroin, cocaine, marijuana, acid, and non-prescribed pills.  (*Id.* at PageID # 630-31.)  He was introduced to heroin approximately nine years ago and used it intermittently through November 2012.  (*Id.* at PageID # 631-32.)  Witness B stopped using heroin at that time, but then relapsed from October to November 2015.  (*Id.* at PageID # 632-33.)  He has been arrested twice on felony charges—once for possession of cocaine and the second time for possession of heroin and cocaine.  (*Id.* at PageID # 634.)  He received intervention in lieu of conviction in both cases, which he successfully completed.  (*Id.*)  At the time of the hearing, he was not under the influence of drugs, alcohol, or any other substances that would affect his ability

to testify.  (*Id.* at PageID # 633.)

After their meeting with Witness A on June 16, 2015, Zollers and Bergman also met with Witness B.  (*Id*. at PageID # 629, 634-635.)  Witness B recalled that Witness A (his wife) called and advised him that law enforcement officers were at their residence and wanted to speak to him about some drug dealers.  (*Id.* at PageID # 635.)  Witness B spoke with the officers on the phone and scheduled a time to meet with them at his residence later that day.  (*Id.*)

Witness B returned to his residence and met with Detectives Zollers and Bergman in their unmarked vehicle.  (*Id*. at PageID # 636.)  The officers presented Witness B the photo array and asked him to circle the photos of the individuals whom he recognized and write his initials and date above the circled photos.  (*Id.* at PageID # 637-40; Gov't Ex. 2(b).)  After reviewing the photos for about five minutes, Witness B circled the photos of five individuals.  (*Id.* at PageID # 639, 669)  At no time did the officers comment as to any of the photographs or whether or not Witness B had accurately or inaccurately selected any photo.  (*Id*. at PageID # 640-641.)  Witness B confirmed that he was not threatened or promised anything in exchange for making identifications. (*Id*. at PageID # 644.)

Witness B testified at the hearing that he was able to identify the individuals in the photo array because he personally purchased drugs – both heroin and cocaine - from them in the past.  (*Id*. at PageID # 645.)  Witness B further testified that these five individuals were associates of one another.  (*Id*.)  He was introduced to them through his wife and would on occasion purchase drugs from them by himself and sometimes while accompanied by his wife.  (*Id*. at PageID # 646.)  If he wanted to purchase drugs, Witness B contacted the group via a telephone number and was directed to a location to meet up with them.  (*Id*. at PageID # 646-648.)  During the period in which he bought, Witness B confirmed that this group was his primary source of heroin.  (*Id*. at

PageID # 648.) He advised that the drug transactions typically occurred car to car, window to window. (*Id*. at PageID # 649.) The transactions were quick, but provided him the opportunity to view the individual or individuals from whom he was purchasing. (*Id*. at PageID # 649-650.) Witness B explained that he was purchasing from this group on a daily basis—multiple times a day—morning, afternoon, and evening. (*Id*. at PageID # 650-651.) During these transactions, Witness B verified that there was sufficient lighting and that he was able to recognize the individuals in the car. (*Id*. at PageID # 651.)

Witness B testified that he was under the influence of heroin during some of these transactions. (*Id.* at PageID # 651.) While on heroin, Witness B would not feel sick. (*Id.* at PageID # 651-52.) If he were sick, however, it would impair his ability to recall events and whom he was dealing with. (*Id.* at PageID # 652.) In relation to the photos that he identified, Witness B was able to recall his interactions with each—in particular, he recalled that John Dixon was "very rude" and a "jerk." (*Id.* at PageID # 654-57.) For example, Witness B explained that "[a] lot of times I would give [John Dixon] a certain amount of money and he would not give me what I asked for." (*Id.* at PageID # 654.) Witness B was happy when John Dixon was not present during a drug purchase. (*Id*. at PageID # 655.)

### 3. Witness D

Witness D is twenty-six years old and resides in the Dayton, Ohio area. (Doc. 89 at PageID # 795.) She graduated high school and is currently unemployed, although she has held jobs in catering, telemarketing, and other food services. (*Id.*) Witness D has a history of using pain pills, heroin, cocaine, and marijuana. (*Id.* at PageID # 796.) She had used heroin for approximately six years and, as of the hearing, had been clean since May 2016. (*Id.*) Witness D has had misdemeanor theft convictions, but no pending cases. (*Id.* at 798.) She is currently on

non-reporting supervision in Kettering and Fairborn, Ohio. (*Id.* at PageID # 799.)

On June 16, 2015, Detectives Zollers and Bergman interviewed Witness D outside of Witness D's home in Fairborn, Ohio. (*Id.* at PageID # 799.) Upon their arrival, the officers introduced themselves and explained that they were investigating the heroin epidemic in Dayton, Ohio and had a few questions to ask her. (*Id.* at PageID # 800.) They asked Witness D about her heroin use and who had been supplying drugs to her. (*Id.*) The officers provided the photo array to Witness D and asked her if she could identify among the photos any of the individuals from whom she had purchased heroin. (*Id.* at PageID # 805; Gov't Ex. 5(b).) While seated in the back seat of the officers' unmarked vehicle parked outside her residence, Witness D reviewed the photos and identified five individuals that she purchased drugs from between 2011 and 2015. (*Id.* at PageID # 800, 803-10.) In addition to identifying each, Witness D was able to provide a specific nickname that she had for each individual: "New Guy", "Little Man", "Okay Man", "Money" (John Dixon) and "Twin". (*Id.*) Witness D stated that all five were recognizable but slots 2, 3, 5 (John Dixon) and 6 were "automatic." (*Id.* at PageID # 808.)

Neither officer advised Witness D as to whether she accurately identified any of the individuals. (*Id.* at PageID # 809.) In addition, no coercion, threats or promises were ever made to Witness D to influence or compel her to make any identification. (*Id.* at PageID # 810-811.) Witness D testified that her heroin use did not affect her ability to communicate with the officers or engage in conversation. (*Id.* at PageID # 801.) She was not high on the day that they visited and was not under the influence of anything that would hinder her ability to communicate with them. (*Id.* at PageID # 801-02.)

Witness D testified that she referred to the group as "Money's Crew" and that they were her primary source of supply for heroin. (*Id.* at PageID # 812.) Witness D further stated that

8

"Money" (John Dixon) was the boss of the crew and that he introduced himself as the "main guy" and instructed people to call him if there were any problems with the heroin or his people. (*Id*. at PageID # 812.) Witness D admitted to purchasing heroin from this group "seven days a week" as well as "morning, noon and night". (*Id*. at PageID # 814, 821.) Once she placed a phone call to the group's number, she was directed to different locations with the transaction ultimately occurring "car to car". (*Id*. at PageID # 814-815.) Witness D testified about her interactions and relationships with the individuals whom she identified—two of whom she considered "like friends." ((*Id*. at PageID # 816-822.) Although the transactions took seconds, Witness D confirmed that she had sufficient time to observe the individual or individuals in the car. (*Id*. at PageID # 820.)

As it relates to "Money" (John Dixon), Witness D referred to him as the problem solver and that if she had problems, he resolved them. (*Id*. at PageID # 818-819.) In addition, Witness D recalled that "Money" could be "rude and arrogant" and was always "in a hateful mood." (*Id*. at PageID # 825.) Witness D testified that she was "one hundred percent certain" of her identification of "Money". (*Id*. at PageID # 829.)

### 4. Bryan

Bryan is forty-one years old, married with four children, and resides in Ohio. (*Id.* at PageID # 713-14.) He studies business management and works as a pipe fitter. (*Id.* at PageID # 714.) He has previously used heroin, cocaine, and pain pills, with his drug of choice being heroin. (*Id.* at PageID # 615.) He began using heroin after he ran out of pain medication for an injury sustained in a car accident. (*Id.* at PageID # 715, 750.) Once he began using heroin, he used it on a daily basis, multiple times a day. (*Id.* at PageID # 716, 724.) As of the hearing, Bryan had not used heroin for approximately one year. (*Id.* at PageID # 716.) Bryan has a criminal history

including charges for possession of heroin and possession of a drug instrument in Montgomery County for which he received intervention in lieu of conviction. (*Id.* at PageID # 717.) He had a prior conviction for possession of a drug instrument, for which he served time in jail. (*Id.* at PageID # 717-18.)

Bryan testified that, on September 30, 2015, he received a text message indicating that he could pick up a free tester, which is a free dose of heroin offered to users to test its quality. (*Id.* at PageID # 720.) When Bryan arrived at the pick-up location, however, he was surrounded by police officers. (*Id.* at PageID # 721.) The officers talked to him and told him that they would let him go and contact him later. (*Id.*) He was not threatened or coerced in any way to speak with the officers. (*Id.* at PageID # 722.) During his first meeting with the officers, Bryan told them about his heroin use—multiple times daily—and gave them his phone so that they could obtain the phone numbers that he used to purchase heroin. (*Id.* at PageID # 723.) He recalled providing the officers the names and phone numbers for "Monster" and "Twin"—two individuals from whom he purchased heroin. (*Id.*) He also provided the names and phone numbers of other people whom he purchased heroin from: "Big Jug," "Bear," "D Dark Skin," "Day Ray" or "Monster," "Twin," and "Fresh." (*Id.*)

About two weeks later, on or around October 15, 2015, Detectives Zollers and Fuller called Bryan and asked to speak with him again. (*Id.* at PageID # 724-725; Doc. 80 at PageID # 505-08.) They met with Bryan in their unmarked vehicle outside of Bryan's residence. (Doc. 89 at PageID # 725-26.) Bryan was provided a photo array containing the first six photos of the set compiled by Gaier and asked if he was able to identify any of the individuals. (*Id.* at PageID # 726, 728; Gov't Ex. 3(b).) Bryan positively identified two of the individuals as people from whom he had purchased heroin. (*Id.* at PageID # 728-729.) Neither detective communicated to Bryan in any

10

way whether or not he had accurately identified any individual. (*Id*. at PageID # 730.) Bryan told the detectives that he knew the two individuals as "Twin" and "Twin's cousin" (John Dixon). (*Id*. at PageID # 730-731.) Bryan indicated that there was "no doubt in his mind" that the individuals that he identified were the same individuals that had personally sold him heroin. (*Id*. at PageID # 731.) He did not believe that he was using heroin at the time he viewed the photos, but he had been using heroin two weeks earlier. (*Id.* at PageID # 728.)

Consistent with the other witnesses, Bryan advised that he obtained a phone number for this group and contacted the number when he was in need of heroin. (*Id*. at PageID # 736-737.) Bryan was then directed to varying locations where he would meet up with someone in the group and purchase heroin. (*Id*. at PageID # 737-738.) Bryan advised that he dealt with Twin "pretty much every morning." (*Id*. at PageID # 739.) Bryan stated that the transactions occurred "car to car" and although brief, he had sufficient opportunity to view the driver conducting the transaction. (*Id*. at PageID # 741-742.) At no time did either Zoller or Fuller threaten, coerce or promise Bryan anything in exchange for identifying these individuals. (*Id*. at PageID # 732-733.)

## II. **LEGAL STANDARD**

Under the principles of due process, an in-court identification following a pretrial identification by photograph is inadmissible "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "The due process concern is heightened when that misidentification is possible because the witness is called upon to identify a stranger whom she has observed only briefly, under poor conditions, and at a time of extreme emotional stress and excitement." *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994).

To determine whether a pretrial identification should be suppressed, courts apply a two-step analysis. First, the defendant must demonstrate that the pretrial identification procedure was unduly suggestive. *Id*. "If the identification procedure was not impermissibly suggestive . . . , there is no due process violation and [the Court] leave[s] it to the jury to determine the ultimate weight to be given the identification." *United States v. George*, 160 Fed. Appx. 450, 454 (6th Cir. 2005). If the pretrial identification was unduly suggestive, then the Court proceeds under the second step to determine whether the pretrial identification was nevertheless reliable under the "totality of the circumstances." *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

When evaluating the reliability of a pretrial identification, courts should consider the following factors:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009) (quoting *Biggers*, 409 U.S. at 199). In sum, the court's analysis should take into account the totality of the circumstances surrounding the pretrial identification "weighed against any 'corrupting effect of the suggestive identification.'" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

### III.  ANALYSIS

Dixon argues that the pre-trial identification procedure used in this case was unduly suggestive because it did not employ the recommended safeguards for photo lineups under Ohio law. (Doc. 91 at 24 (citing Ohio Rev. Code § 2933.83 (Minimum requirements for live lineup or photo lineup procedures)).) According to Dixon, Ohio's identification procedure "is considered less suggestive and more reliable" than the procedure used in this case. (*Id.* (citing 2009 Ohio SB 77, synopsis and Ohio Rev. Code § 2933.83(C)(3)).) There is no dispute that the pre-trial

identifications here did not conform to Ohio law. That fact, however, does not compel the conclusion that Dixon's due process rights were violated.

Dixon specifically complains that, in contrast to Ohio's procedure, the officers who administered the pre-trial identifications here did not: (1) obtain a description of the suspects from the witnesses before compiling and presenting the photo array, (2) include "filler" photos, i.e., photos of individuals who are not suspects but resemble the witnesses' descriptions of the suspects, (3) have a blind administrator present the photo array, (4) read instructions to the witnesses stating, among other information, that the photo array might or might not contain a photo of a suspect. In addition, Dixon contends that he was prejudiced because the photos in the photo array were pulled from both the Ohio BMV database and Justice Web, and the officers made no effort to ensure that the witnesses were separated from each other.

Under the two-step analysis, the first question is whether these alleged defects in the pre-trial identification procedure caused the photo array to be unduly suggestive. When presenting the photo arrays, the officers did not tell the witnesses that it included photos of suspects in the investigation. However, the witnesses were likely to have inferred just that based on the events leading up to their presentation. (As Gaier testified, all of the individuals that he included in the photo array were in fact suspected of trafficking drugs in the Dixon Organization.)

At the first meeting with each witness, the officers informed the witness that they knew that he or she was a heroin user. The officers then expressed interest in identifying the people who sold them heroin. Shortly thereafter, during that visit or a subsequent visit, the witnesses were presented the photo array and asked to circle the photo of anyone they could identify. It would have been natural for the witnesses to conclude that they were looking at photos of men suspected of selling them heroin—and, in fact, they were. At the hearing, Witness A acknowledged that she

understood that the officers were showing her photos of people suspected of dealing drugs. (Doc. 81 at PageID # 610.) Based on these facts, the pre-trial identification procedure may have been unduly suggestive.

Even if the procedure were unduly suggestive, however, that finding is not dispositive. The Court still must determine whether, considering the totality of the circumstances, the witnesses' identifications are nevertheless reliable. *Manson v. Brathwaite*, 432 U.S. 98, 114-16 (1977). The relevant factors include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S.188, 199-200 (1972).

Applying these factors, the witnesses' pre-trial identifications are reliable. This is not a case where the witnesses observed the defendant "only briefly, under poor conditions, and at a time of extreme emotional stress and excitement." *Ledbetter*, 35 F.3d at 1070. To the contrary, the witnesses purchased heroin from the Dixon Organization daily, if not multiple times daily, for periods ranging from approximately two to six years. The witnesses therefore had ample opportunities to view the defendants, including Dixon, during their drug transactions. In addition, the witnesses' descriptions of their interactions with defendants demonstrate that they paid a significant degree of attention to the men from whom they purchased drugs. The witnesses recognized not only the defendants' physical features, but recalled their personality traits as well. Each of the witnesses testified to a high degree of certainty in their identifications. In each instance, the amount of time that passed between the witness' interactions with the defendants and his or her identifications of them was not so long as to cast doubt on their accuracy.

In sum, even if the pre-trial identification procedure was unduly suggestive, the witnesses' identifications are still reliable under the totality of the circumstances. As a result, the Court denies the Motion to Suppress.

## IV. CONCLUSION

For the foregoing reasons, Dixon's Motion to Suppress (Doc. 57) is **DENIED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, November 28, 2016.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE